## BLOODWORTH et al. v. THE STATE.

The various grounds alleging error on the admission of certain evidence during the trial of the case are without merit. The charges of the court complained of, and failures to charge, are likewise without merit. In view of the entire charge, and of the facts of the case, the ground of the motion complaining that the venue was not proved is also without merit. In view of the counter-affidavits filed, together with the failure of movants to procure and attach the necessary supporting affidavits to charges made of improper conduct on the part of outside persons coming in contact with the jury during the trial of the case, these grounds of the motion are insufficient to require a new trial. None of the grounds of the motion for new trial are sufficient to cause a reversal; the evidence authorized the verdict, and the court did not err in overruling the motion for new trial.

No. 4386. OCTOBER 14, 1924.

Murder. Before Judge Munro. Taylor superior court. February 1, 1924.

The evidence is voluminous; and as error is assigned both upon the ground that it does not support the verdict, and that the venue was not proved, enough of the evidence is set out in this statement of facts to show that these grounds are without merit.

U. S. Underwood, a brother of the deceased and a witness for the State, testified: "Howard F. Underwood was my brother; he lived near Potterville, in the southern portion of the county [Taylor]. He had a wife and nine children, the oldest about twenty-eight years, and the youngest about two months, old. I don't think I saw my brother, Howard F. Underwood, on the third day of December, but I saw him on the Wednesday following, which was December 5th. Sunday was the last date I saw him alive, and I saw him on the following Wednesday, and he was dead then. I saw him then on the road leading from the Reynolds and Garden Valley road, about four or five hundred 'yards from the Reynolds and Garden Valley road, on a road that leads out towards Earl Marshall's place. He traveled for F. W. McNess Medicine concern, in a Ford automobile. I don't think he had a bank account; he carried all his money with him, I think. When I saw his body he was lying in the back of his car, on his medicines, in between the back seat and the front seat. He was kinder rolled over down in the back on some boxes in which he had his medicine. There was a hole right through his head right there [indicating]. It was a large hole. I think the load went in right along there

[indicating]. His legs were naked from here to there [indicating], and were up in one corner of the seat like. The car was headed east, toward the river. . . It was in Taylor County where I saw his body in his automobile. . . I saw the defendants, Gervis Bloodworth and Willie Jones, in Columbus, after the body was discovered. The body was discovered Wednesday morning, and I saw them Thursday night. I had a conversation with Gervis, and he made a statement to me freely and voluntarily. There were no threats, or inducements or rewards or promises. . . Bloodworth said they waved my brother down between Ideal and Garden Valley. Said Willie Jones asked him to let them ride up the road with him, and he stopped and took them in, and they rode up the road until they got almost to the road which turns off the Reynolds and Garden Valley road going to Potterville; and he said at that place Willie Jones shot my brother, Howard F. Underwood. He said he did not know anything about his going to shoot him until he fired the shot. Said Willie shot him, and he grabbed the steering-wheel of the car and held it in the road. Said they were running tolerably peart. Said they rolled my brother over in the back seat and went down the road to the creek near Reynolds, and turned around and came back to the road which turns to the left leading towards the river, and went down that road to where they stopped. Said the car didn't exactly stick, but he got scared and left, and Jones left with him. Said he did not get any of the money, and that Jones got all of it, but that later Jones gave him the purse which was taken off of him at the time he was arrested on Wednesday. This conversation took place in the jail at Columbus. Jack Hobbs, Col. Gilbert Robinson, and Jake Bryan were with me when I went to jail to see these defendants." (The court instructed the jury not to consider this as against Willie Jones, as it was only admissible for what it was worth in regard to its probative value as a confession against Gervis Bloodworth.) . . Cross-examination: "My brother's body was found in Taylor County. I know that, because the Macon County line runs below that . . I feel like I know that the body was in Taylor County, just as well as you know you are here in this court-room. I know it by what I have heard, and I have also traced the map, and I think that is reason enough. I don't know where my brother was killed. . . Mr. Bloodworth

said the place where Mr. Underwood was shot was just before reaching the place where my brother would have turned to the left off the Reynolds and Garden Valley road to go to Potterville. And that is in Taylor County."

Dr. T. G. Turk, sworn for the State, testified: "I ran my finger in the wound clear through the head and located the load of shot just back of this eye, over here, between the eye and ear, and felt the shot with my finger. They were not what is called buckshot, just ordinary birdshot. . . The gun was right at his head, because his hair was burned all around the entrance. The place I discovered the body in the automobile is in Taylor County."

Mrs. Vera Windham, for the State, testified: "I live in Taylor County. I knew Howard F. Underwood in his lifetime. He had an automobile. I knew his car by the sign. . . I saw it on the afternoon of December 3. It passed our home. It was going to town. . . It went to Reynolds. I saw it again that afternoon. I saw it twice altogether. The first time I saw it pass something attracted my attention, at the corner. It was a noise. I thought it was a punctured tire. I saw some smoke at the corner. The spot where I heard the automobile and heard the noise is in Taylor County. The smoke was coming out of the car. When I saw the automobile the second time it was going towards the river. . . That automobile did not stop after the noise I heard. It just went on."

Mrs. Bedford Tucker testified: "I live in Macon County. I know Willie. I have seen Gervis, but I don't know him personally. I don't know whether I would know him at sight or not. I have seen him before, but don't know whether I would know him or not. I saw Willie Jones on or about December 3d, in the afternoon. He passed by home, he was traveling on the right fender of Mr. Howard Underwood's car—the back fender. They were headed towards Reynolds at that time. It was four o'clock. I had been seeing Mr. Howard F. Underwood's automobile ever since he had it. . . I knew Howard F. Underwood. I knew the automobile he traveled in. The automobile I saw Jones on that afternoon was Mr. Howard Underwood's. Jones had a shotgun when I saw him, and he was on the right rear fender, the back. There was just one other person in the automobile besides Mr. Underwood. Mr. Underwood was driving the car at that time. I

could not recognize who was in the car with Mr. Underwood."

Nora Blanch Jones, for the State, testified: "I think I saw Willie Jones or Gervis Bloodworth about December 3d. I do not remember about the time that Howard Underwood was killed. I heard about his being dead, but I didn't hear much about it. Just about the time I heard about it, or just after, I saw those two men here. I seen them Tuesday. I saw Will Tuesday morning. . . Will come over there and went to get a drink of water, and he could not draw it, and he drank out of the mule trough. . . I did not see Bloodworth that day—only that evening. He came to our house to get something to eat. I heard Gervis tell Will he burned up his shirt—coat—is all I know. I don't know why he burned it. I did not see him burn it. I did not see any blood on it. I don't know where they spent the night. . . I heard Gervis tell Will he had burned his coat and shirt. Miss Jule went after Will's shirt because he told her to go over there and clean it up, and he started out on the front porch. He did not tell her there was any blood on it. I had not been planning to .go with them to Columbus. . . I am ten years old." .

C. F. Cummings, for the State, testified: "I am employed as jailer by Muscogee County. In that capacity I have seen Willie Jones and Bloodworth. About a week ago I heard Willie Jones make a statement regarding the death of Mr. Underwood in the jail at Columbus. That was made in the presence of yourself, Mr. Layfield, and myself. It was freely and voluntarily made. There were no threats made to Mr. Jones, no rewards, or no promises of reward. You [Mr. Flournoy] talked to Mr. Jones first in my presence about this. You told him anything he would voluntarily say—he didn't have to say anything—but just anything he wanted to say about it, to just say what he wanted to. In regard to his privilege of refusing to answer, you told him if you asked any question he did not want to answer it would be perfectly all right. . . Jones said that he shot Mr. Underwood with a shotgun. He said they were walking. Q. Was that at the time they met him or at the time they shot him? A. At the time they met him. Jones said they got in the car. Bloodworth was with Jones at that time. He said he shot him with a shotgun. He said he got out of the car and left. I don't remember where he said he went. Said he left the car. Said he was in the road at the time they

shot. I don't remember just where. That is all I remember of the statement. I don't think I remember any questions being asked Jones about what effect the shot would have on Mr. Underwood. He said that they wanted to get some money to go off somewhere, I think; to make a trip somewhere."

. C. E. Benns, for the State, testified: "Mr. Bloodworth said he shot him. I think he said with a single-barrel shotgun. Said he got the gun at a camp at Garden Valley. They seemed to have had a shingle-mill camp there. Jones got the gun. Jones said he did the shooting; said he was standing on the running-board when he shot. I asked them if there was any plot between them, and they said, 'Yes,' and I asked if they had a grudge against Mr. Underwood, and they said, 'No.' I told them I had heard there was a sign given by Bloodworth when he was to do the shooting, when Jones was doing the shooting, and he said, 'Yes.' And Bloodworth said he leaned this way [indicating]. I asked if that was the sign, and he said, 'Yes,' to do the shooting. The reason they assigned for the killing—they said they wanted the money. They said they were going to take a trip. I asked where the shooting took place, and they said, 'Right near the forks of the road to Potterville and Garden Valley.' I asked them how far they went on then, and Bloodworth . . he said, 'Bloodworth took the wheel and drove the car farther on.' He said Mr. Underwood was killed instantly. Bloodworth said he drove the car till they got stuck in the mud. I think he said at the foot of a hill near a branch. They were both there together during all of that conversation. Jones was there during all of that. Jones was doing most of the talking. Bloodworth would nod his head that those facts were true, that those were the facts. . . Will Jones' father was present on the outside. I will have to explain a little. I believe Jones said that the money that was found by the officers was the money that they got."

Louis Beeland, for the State, testified: "I am an officer of Taylor County. As such I arrested Bloodworth. He was at his mother's house, they said, when I arrested him. It was late in the evening, on Wednesday, the same day Mr. Howard F. Underwood's body was found in the morning. Yes, I have seen this purse before. I got it out of Mr. Bloodworth's pocket, coat pocket. I searched him as soon as I arrested him. Willie Jones was down

in the swamp, next to the edge of the swamp, at that time; about half a mile from where Mr. Bloodworth was, I guess. There was a little girl with him, the little girl who was on the stand. Nora Jones, I believe, is her name. I did not arrest Jones. We turned the dogs loose, and they were slipping around, and Jones came walking up, and I think Papa and Mr. Poole arrested him. I found a couple of suit-cases and a raincoat there. . . We found Jones and Bloodworth in Macon County. . . Yes, I heard Bloodworth make a statement to me about this. It was freely and voluntarily made. There were no threats or inducements offered him. No rewards were offered him. Q. Where did he say he got this from? A. Got it off of Mr. Underwood. I asked him whose pocket-book it was, and he said it was Mr. Underwood's."

J. E. Chapman, for the State, testified that he saw Mr. Underwood about between 11 and 12 o'clock on the day he was killed, and he had "not less than $150 in his pocket."

J. T. Fountain testified: "I live in Taylor County; have been living here nearly fifty-four years, . . in the western part, about half a mile from Potterville. Have lived there for 28 or 29 years. I am familiar with the country in and near Potterville. I am familiar with the forks of the Garden Valley-Potterville road, the one that goes into what we call the Reynolds and Garden Valley road. That road forks in Taylor County, just across a lot of land from the Macon County line."

There was much other testimony similar to that set out above.

*C. W. Foy, W. E. Steed,* and *Homer Beeland,* for plaintiffs in error.

*George M. Napier, attorney-general, W. R. Flournoy, solicitor-general, T. R. Gress, assistant attorney-general, G. C. Robinson,* and *C. G. Daniel,* contra.

HILL, J. Gervis Bloodworth and Willie Jones were jointly indicted and tried for the murder of Howard F. Underwood. The jury returned a verdict of guilty against both, without recommendation; and they were sentenced to be hanged. They jointly made a motion for new trial on the usual general grounds and thirty-five amended grounds, which was overruled, and they excepted. The theory of the State, which is supported by evidence, is that the defendants entered into a conspiracy to take the life

of Underwood for the purpose of obtaining his money, and, armed with a shotgun, they hailed him as he was riding along the public highway selling patent medicines, and were permitted by him to get into his automobile and ride. Bloodworth sat on the front seat with Underwood, who was driving the car, and Jones, with the gun, sat on the right-hand rear fender of the car. Jones did not get inside the car, as the rear space was filled with medicine cases, which Underwood carried for some medicine company he represented, and which he peddled throughout the country near where he lived. When the car had gone some distance, and as it approached the road which turns off from the Reynolds and Garden Valley road going to Potterville, near which place the deceased lived, Bloodworth gave the signal (a nod of the head) to Jones to fire, which he did, the entire load of shot striking Underwood near his right ear and ranging toward the left eye, killing him instantly. Bloodworth then caught the steering-wheel of the car while it was still running, and drove about half a mile. The defendants rolled the deceased from the front seat of the car to the rear, and took what money he had, except an amount of small change. They then drove back in the direction from which they had come, and turned from that road into another leading toward the river. Before reaching the river, the car stuck in the mud and the defendants abandoned it. The homicide occurred on December 3, but the body of the deceased was not discovered until December 5, two days later. When found his hip-pockets were turned inside out, and there was only a small amount of change found on his person, although he was known to carry large sums of money. According to the evidence the defendants took the money from the person of Underwood after he was killed, except the small change.

It is insisted by plaintiffs in error, as the death penalty was inflicted on them, that this court should look with great concern upon all of the alleged errors assigned, to see whether or not they may have influenced the jury in withholding a recommendation to mercy as to either or both of the defendants. It is needless to say that this court has looked, and will ever look, to all alleged errors assigned in bills of exceptions or motions for new trial, and it has done so in this case. But this court has said that "the jury in the trial of one who is charged with murder, if they find the

accused guilty, are invested by law with the power of fixing the punishment, by recommendation to life imprisonment. Whether they will so recommend or not is a matter solely in their discretion, which is not limited or confined in any case." *Cohen* v. *State*, 116 *Ga.* 573 (42 S. E. 781). The charge of the court in the instant case, with reference to the right of the jury to recommend the defendants to the mercy of the court, is not complained of, as in the *Cohen* case, where the judgment of the lower court was reversed on account of the charge. On this branch of the case the court here charged the jury that "if you did [do] desire that the extreme punishment of the law should not be inflicted upon the defendants, you would have the right to recommend them to the mercy of the court, and in that case the punishment would be imprisonment in the penitentiary for life. In case of a conviction and if you should desire that the extreme penalty of the law should not be inflicted upon the defendants, the form of your verdict would be, 'We, the jury, find the defendants guilty, and we recommend them to the mercy of the court.' " It will thus be seen that the court below instructed the jury as to their right to recommend the defendants to the mercy of the court, without any qualification or restriction whatever, which is the law. We have also examined carefully the numerous grounds (35) of the motion for new trial, and find no reversible error in them. And none of the rulings of the court as set out in the motion for new trial could have the effect of modifying the rule given in charge with reference to the right of the jury to recommend the defendants to the mercy of the court, if they saw fit to do so, as did the charge in the *Cohen* case, supra.

So far as the general grounds of the motion for new trial are concerned, it is sufficient to say that the evidence, as set out in the foregoing statement of facts, shows this to have been a case of murder without excuse, justification, or mitigation. An old man, plying his usual vocation of selling patent medicines, out of the goodness of his heart had let the defendants ride with him in his automobile, the one beside him, and the other in the rear on the running-board of the car. Without warning to the deceased, one of the defendants gave a sign or signal to the other, who shot the deceased with a shotgun from the rear, causing his instant death. Under these circumstances the jury were fully

warranted in finding the defendants guilty of murder, without recommendation. It is true they could have recommended mercy had they seen fit to do so, but they did not. With the question of whether capital punishment is ever right (as suggested by one of counsel) we have nothing to do. It is the law of the land, which declares that "the punishment for persons convicted of murder shall be death, but may be confinement in the penitentiary for life, . . if the jury trying the case shall so recommend," etc. · Penal Code, § 63. The jury trying this case did not recommend the defendants to mercy; and the evidence being sufficient to authorize the verdict, we are powerless to interfere. One of the purposes of the law is to protect human life from the lawless, and those who utterly disregard it and take the lives of their fellow men, without excuse or justification, can not justly complain if their lives are demanded in order to protect the innocent and defenseless. Society can not be protected except by the observance and enforcement of the law. And while we as *individuals* may sympathize with the unfortunate young men sentenced to death in this case, as *officials* we are bound to uphold the law, and see that "justice is done, though the heavens fall."

In *Eberhart* v. *State,* 47 *Ga.* 598, 609, Judge McCay, speaking for the court, well and forcefully said: "It gives us great pain to be compelled, by our sense of duty to the law and to the public, to affirm this judgment. We have, however, no sympathy with that sickly sentimentality that springs into action whenever a criminal is at length about to suffer for crime. It may be a sign of a tender heart, but it is also a sign of one not under proper regulation. Society demands that crime shall be punished and criminals warned; and the false humanity that starts and shudders when the axe of justice is ready to strike, is a dangerous element for the peace of society. We have had too much of this mercy. It is not true mercy. It only looks to the criminal, but we must insist upon mercy to society, upon justice to the poor woman whose blood cries out against her murderers. That criminals go unpunished is a disgrace to our civilization, and we have reaped the fruits of it in the frequency with which bloody deeds occur. A stern, unbending, unflinching administration of the penal laws, without regard to position or sex, as it is the highest mark of

civilization, is also the surest mode to prevent the commission of offenses." *Judgment affirmed. All the Justices concur.*

RUSSELL, C. J., and ATKINSON, J., concur in the result.